Argued and submitted August 18, 2011, reversed and remanded
February 15, 2012

Randy DEW,
Personal Representative of the Estate of
Donna Jones, Deceased,
*Plaintiff-Appellant,*

*v.*

BAY AREA HEALTH DISTRICT,
dba Bay Area Hospital;
North Bend Medical Center, Inc.;
Radiology Associates, PC,
an Oregon corporation;
and Philip Keizer, M. D.,
*Defendants,*

*and*

Steven TERSIGNI, M. D.,
*Defendant-Respondent.*

Coos County Circuit Court
09CV0101; A145619

278 P3d 20

Elden M. Rosenthal argued the cause for appellant. With him on the briefs were John T. Devlin and Rosenthal Greene & Devlin, P.C.

Matthew J. Kalmanson argued the cause for respondent. On the brief were Marjorie A. Speirs and Hoffman Hart & Wagner, LLP.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This is a wrongful death action in which plaintiff, the personal representative of the decedent's estate, alleged that multiple defendants committed medical malpractice causing decedent's death. The jury found that only Dr. Tersigni (defendant) was negligent, but also found that his negligence did not cause decedent's death. Plaintiff limits his appeal to the judgment entered in favor of defendant, raising three assignments of error. He asserts that the trial court erred by (1) excluding a portion of defendant's deposition testimony in which defendant admitted that the decedent could have benefitted from having a nasogastric (NG) tube inserted; (2) barring plaintiff from cross-examining defendant on the admission he made during his deposition; and (3) excluding rebuttal testimony that NG tubes are used with patients in emergency settings at the hospital where a defense expert witness worked, thereby contradicting that witness's testimony that NG tubes should not be used with emergent patients. We conclude that the trial court erroneously excluded defendant's deposition testimony, as defendant contends in his first two assignments of error, and reverse and remand for a new trial on that ground. We do not reach plaintiff's third assignment of error concerning the rebuttal testimony, because the issue may very well not arise on remand.

Unless otherwise noted, the facts are undisputed. On February 14, 2007, Donna Jones (decedent) went to Bay Area Hospital complaining of extreme abdominal pain. Dr. Woods, the emergency room physician on duty, examined her and ordered a computerized tomography scan (CT scan) and x-rays. Dr. Keizer, the on-call radiologist, reviewed the CT scan, called Woods regarding his findings, and dictated a CT scan report, which stated that decedent's "esophagus is fluid-filled" and that "[a]ir fluid levels are seen in the stomach and small intestine, with small bowel distention." Keizer's impression of the scan was that it showed, among other things, "[p]robable ileus vs[.] early small bowel obstruction." After reviewing the CT scan, Woods called defendant, the on-call surgeon, for a surgical evaluation.

Defendant did not review the CT scan or x-rays, nor did he review Keizer's radiology report on the CT scan, but

defendant knew they were available to him through the hospital's computer system. Instead, based on his physical examination of decedent and discussion with Woods, defendant concluded that decedent required emergency laparoscopic surgery.[1] Defendant wrote into decedent's chart that decedent had a CT scan that was "normal, except for an enlarged gallbladder" and "pericholecystic fluid,"[2] or fluid in the area of the gallbladder. Had defendant reviewed the CT scan or x-rays or read the CT scan report, he would have noticed decedent's fluid-filled esophagus and stomach.

Defendant called Dr. May, the on-call anesthesiologist, about the surgery defendant was planning to conduct. May asked defendant whether decedent needed an NG tube. Defendant replied "no." Defendant explained at trial that, "[b]ased on my clinical evaluation, [decedent] hadn't been throwing up, she didn't have signs of obstruction. It wasn't my general practice at that time to place an NG tube in a patient that I was going to take a gallbladder out on."

Before the surgery began, May gave decedent paralyzing drugs and performed a rapid sequence induction, which involves inserting an endotracheal tube into a patient's windpipe to allow the patient to breathe while she is anesthetized. As May started to perform the rapid sequence induction by first inserting a laryngoscope in the back of decedent's mouth, brown fluid flowed out of decedent's esophagus, which prevented May from inserting an endotracheal tube into her windpipe. Decedent was at risk of choking on her own vomit. May emergently inserted an endotracheal tube down decedent's esophagus and used it as a makeshift NG tube to suction fluid out of her esophagus. Plaintiff introduced evidence that, while doing so, May tore decedent's pharynx, the passage leading up from her esophagus to behind her mouth and nose. After the fluid had been suctioned out, May successfully inserted another endotracheal tube into decedent's windpipe and anesthetized decedent.

---

[1] Defendant testified that, at the time, he was not certain what afflicted decedent but believed that the gallbladder may have been the main culprit. He chose to perform laparoscopic surgery to look for the cause of decedent's pain.

[2] "Peri-" means "[a]round, about, near[,]" and "cholecystic" means "[r]elating to the cholecyst, or gallbladder." *Stedman's Medical Dictionary* 337, 1345 (27th ed 2000).

Defendant then performed laparoscopic surgery and removed decedent's gallbladder. Through the course of the night, decedent's condition worsened, and so defendant performed a second surgery and discovered that decedent had ischemic bowel disease, and part of her intestine was damaged or dead. Defendant removed the bulk of decedent's small intestine and part of her large intestine. A few days after the surgery, the doctors discovered an infection in decedent's throat. She was transported to Oregon Health Science University in Portland, where surgeons discovered a tear in her pharynx and an infection that was destroying the tissues in her neck. Decedent died as a result of complications from the infection in her neck.

Plaintiff, decedent's son and personal representative, filed a negligence claim against defendant; the hospital, which employed emergency room physician Woods; and radiologist Keizer and his employer, a radiology medical group.[3] Plaintiff alleged that their negligence caused May to tear a hole in decedent's pharynx when he attempted to use the endotracheal tube as a makeshift NG tube, which led to decedent's death. Specifically against defendant, plaintiff alleged five theories of negligence: (1) defendant failed to examine decedent's x-rays before surgery, (2) defendant failed to examine decedent's CT scans before surgery, (3) defendant failed to read the report interpreting the CT scan, (4) defendant failed to insert an NG tube in decedent's esophagus before surgery, and (5) defendant advised May that it was not necessary to insert an NG tube into decedent's esophagus before anesthetization. Plaintiff's theory of the case essentially was that, had defendant inserted an NG tube prior to anesthetization, May would not have torn decedent's pharynx, and decedent's throat and neck would not have become infected, causing her death.

Plaintiff introduced evidence that defendant breached the standard of care by failing to look at the CT scan and x-rays before surgery and by failing to ensure placement

---

[3] Further references to Keizer's motions and arguments at trial include references to those of his medical group; the trial court instructed the jury that Keizer's actions should be considered those of the medical group.

of an NG tube to decompress decedent's stomach and esophagus. Plaintiff also sought to introduce defendant's pretrial deposition testimony relating to that failure. At his deposition, defendant testified that, after the surgery, he had looked at the CT scan and radiology report. Plaintiff's counsel asked the following question:

> "[Plaintiff's counsel:]   Okay. And again, at that same time period did—did you think at the time that you looked at the CT scan and looked at the radiology report, * * * we should have used an NG tube?
>
> "* * * * *
>
> "In other words, was that what you were thinking after you looked at the scan and looked at the radiology report?
>
> "[Defendant:]   I looked at it and felt that you could use an NG tube."

During trial, plaintiff attempted to read that deposition passage into evidence during his case-in-chief.

Defendant objected based on relevancy. Defendant argued that the proposed testimony involved "a hindsight question," pointing to part of defendant's deposition testimony immediately following the passage plaintiff sought to introduce:

> "[Plaintiff's counsel:]   But you weren't using your retrospectoscope to—in saying, Gee, you know, we should have used an NG tube?
>
> "[Defendant:]   Probably. I mean, that's—you look at all the fluid and say she could have benefited possibly from an NG tube."

The court sustained the objection. The next day plaintiff asked the court to reconsider, and the court took the issue under advisement before sustaining the objection again.

At the conclusion of plaintiff's case-in-chief, Bay Area Hospital and Keizer moved for a directed verdict based on plaintiff's failure to prove "causation." Specifically, they argued that, even if Keizer or Woods had failed to convey the pertinent findings from the CT scan or x-rays to defendant as alleged, plaintiff offered no evidence that defendant would have inserted an NG tube before surgery had he known the

information. In response to the motions, among other things, plaintiff told the court that the excluded deposition testimony supported his theory that defendant would have inserted an NG tube had he looked at the CT scan or x-rays. The trial court denied the motions.

During his case-in-chief, defendant testified on his own behalf. Defendant's counsel asked defendant whether he considered inserting an NG tube in decedent before surgery. Defendant replied that, given his "clinical evaluation," he had "decided not to place the NG tube [in decedent]." On cross-examination, plaintiff attempted to ask defendant about the excluded deposition testimony. The trial court stopped plaintiff's line of questioning on the same relevancy basis. Numerous defense experts also testified, including two surgeons, two anesthesiologists, and two emergency medicine physicians. Basically, they collectively testified that an NG tube should not have been used before decedent was taken to surgery under the circumstances, it would have been risky to do so, and defendants had not acted negligently.

At the close of all the evidence, the hospital and Keizer again moved for a directed verdict based on plaintiff's failure to prove causation. They again argued that there was no evidence that defendant would have acted differently had he become informed of the findings from the CT scan and x-rays. Defendant also moved for a directed verdict based on causation, but he chose not to argue the absence of evidence that he, himself, would have acted differently. Defendant instead argued that, because May testified that he, May, would not have done anything differently had he known of decedent's fluid-filled stomach and esophagus, any negligent acts that defendant committed did not cause decedent's death. The trial court denied the motions.

In closing argument, defendant explained that the point of plaintiff's claim was that, had he looked at the CT scan or the radiology report, defendant would have placed an NG tube. Defendant argued to the jury that "he had, at that moment when he made that decision [to go to surgery], everything he needed." Defendant argued that he told May that defendant "did not believe that she needed an NG tube," and that he had considered it and he rejected it." Further,

even if an NG tube is to be placed in a patient, that should happen not in the emergency room, but only after the anesthesiologist places the endotracheal tube in the windpipe to protect the patient's airway. Defendant also argued that May would not have changed his actions even had May known about the findings from the CT scan and x-rays, and so the jury could not find causation. Keizer and the hospital also argued to the jury that defendant's review of the CT scan and report would not have changed defendant's "plan of action" to take decedent to surgery without placing an NG tube in her, so "causation" was the critical and missing element in the case.

The jury returned a general verdict finding that only defendant was negligent, that is, that his conduct fell below the standard of care, in one or more of the ways alleged in the complaint. However, the jury found that defendant's negligence did not cause decedent's death.[4]

On appeal, as noted, plaintiff advances two assignments of error relating to deposition testimony in which defendant admitted that decedent "could [have] use[d] an NG tube" before surgery. First, plaintiff argues that the trial court erred in excluding that testimony from plaintiff's case-in-chief. Second, plaintiff contends that the trial court erred

---

[4] Specifically, the verdict form provided:

"We, the jury, being first impaneled and sworn to try the above-entitled cause, do find our verdict as follows:

"1. Were any of the defendants negligent in one or more of the ways alleged by plaintiff?

| | | |
|---|---|---|
| "Steven Tersigni, M.D. | Yes X | No |
| "Philip Keizer, M.D. | Yes | No X |
| "Bay Area Hospital | Yes | No X |

"If your answer to Question 1 for all defendants is 'No,' your verdict is for the defendants. Your Presiding Juror should sign and date this verdict form. Do not answer any more questions.

"If you answered 'Yes' as to *any* defendant in Question No. 1, go to Question No. 2.

"2. Did any or all of the defendants' negligence cause the death of [decedent]?

| | | |
|---|---|---|
| "Steven Tersigni, M.D. | Yes | No X |
| "Philip Keizer, M.D. | Yes | No X |
| "Bay Area Hospital | Yes | No X" |

in prohibiting plaintiff from cross-examining defendant about his admission. Because the assignments of error involve the exclusion of the same portion of defendant's deposition testimony, we discuss those assignments together.

As a preliminary issue, defendant contends that plaintiff did not preserve the assignments of error. According to defendant, at trial, plaintiff argued that the deposition testimony was relevant to establish negligence, but, on appeal, plaintiff argues that it is relevant to show causation.

To preserve an issue for appeal, a party's explanation of its position must be "specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). One of the primary purposes of preservation is to ensure that the opposing party is not surprised, misled, or denied the opportunity to meet the argument in the trial court. *State v. Roble-Baker*, 340 Or 631, 640, 136 P3d 22 (2006); *see also Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) (explaining that preservation allows a trial court to avoid or correct its own error, ensures fairness to an opposing party, and fosters full development of the record).

In light of that standard, we conclude that the trial court and defendant understood that plaintiff's purpose for introducing the subject testimony was to prove both causation and negligence. Whether negligence on the part of any of the defendants caused decedent's death was a central and hotly contested issue at trial. Although plaintiff's counsel never said to the trial court that the testimony was relevant to prove causation in so many words, it was implicit in his discussions with the court.

Plaintiff's response to the first set of directed verdict motions is consistent with plaintiff's position on the importance of the evidence to his claim. After plaintiff presented his case-in-chief, Keizer and the hospital moved for a directed verdict, arguing that plaintiff had failed to prove causation. Specifically, they argued that, even if the emergency room doctor, Woods, and Keizer were negligent in failing to convey the findings from the CT scans and x-rays to defendant, the

causal connection between the negligence and decedent's death was broken because defendant would not have inserted an NG tube before May anesthetized decedent. Plaintiff responded, in part, that the excluded deposition testimony addressed that issue. In other words, in plaintiff's view, the testimony constituted evidence both that defendant should have *and* would have done so. Indeed, defendant testified at his deposition that, when he looked at the CT scans and x-rays, he concluded that decedent "could use an NG tube." Plaintiff's response to the motions for directed verdict, which came before plaintiff again tried to introduce the testimony during his cross-examination of defendant in defendant's case-in-chief, was specific enough to ensure that the trial court could identify that plaintiff's relevance argument went to both causation and negligence. Defendant cannot claim surprise, or that he was misled or denied an opportunity to meet the argument in the trial court. Therefore, we conclude that plaintiff's first and second assignments of error are preserved.

We turn to the merits of those assignments of error. Plaintiff contends that the trial court erroneously excluded deposition testimony that was relevant to prove that defendant's negligent conduct caused decedent's death. We review determinations of relevance for errors of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). A trial court has no discretion under OEC 401 to exclude evidence that is logically relevant. *Id*. The relevance threshold is low. *State v. Voits*, 186 Or App 643, 653-54, 64 P3d 1156, *rev den*, 336 Or 17 (2003), *cert den*, 541 US 908 (2004). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. OEC 401.

Here, defendant's deposition testimony was initially offered to prove that he would have inserted an NG tube before surgery had he looked at the CT scan, x-rays, and radiology report that showed decedent's stomach and esophagus were filled with fluid. Citing *Foxton v. Woodmansee*, 236 Or 271, 278, 386 P2d 659 (1963), defendant argues that the deposition testimony is not relevant as a matter of law, because a

doctor cannot be judged by after-acquired knowledge or the results of treatment. As noted, the trial court accepted that argument in excluding the deposition testimony.

In *Foxton*, the defendant physician performed surgery on the plaintiff's wrist fracture and placed her arm and hand in a cast. Several weeks after the surgery, however, a surgeon reset the fracture and placed a second cast on the plaintiff's hand, while the defendant continued to provide care to the plaintiff. After the second cast was removed, the plaintiff discovered that she had abnormalities in her arm, hand, and wrist. *Id.* at 276. The plaintiff alleged that the defendant improperly placed the first cast after the surgery. The jury returned a verdict for the defendant, but the trial court set it aside. It reasoned that the defendant was responsible for subsequent malpractice by the surgeon, who testified at trial that the second cast was left on the plaintiff's hand too long. *Id.* The Supreme Court reversed the ruling, holding that the surgeon's admission was not a judicial admission of negligence binding on the defendant. Noting that a doctor's negligence "is to be determined by reference to pertinent facts then in existence, of which he knew or should have known in the exercise of due care, when the operation was performed[,]" the Supreme Court explained that, even if the defendant had so testified, the statement about the second cast would not constitute an admission of negligence. *Id.* at 278-79. Rather, the question of negligence remained a question of fact for the jury, where the surgeon testified with the benefit of hindsight and subsequently occurring conditions and there was evidence that such a cast typically could be left on for a longer period of time. *Id.* at 280.

Defendant's reliance on *Foxton* as a basis for affirming the trial court's ruling, therefore, is unavailing. The Supreme Court in *Foxton* did not hold that the surgeon's testimony was irrelevant or improperly admitted evidence. And, contrary to defendant's argument, *Foxton* supports the relevance and admissibility of defendant's testimony, which concerned existing facts that, under plaintiff's theory of the case, defendant should have known in the exercise of due care when he set out to perform the surgery on decedent.

Plaintiff's counsel asked defendant twice during the deposition whether, once he had looked at the CT scan findings, defendant thought that decedent could have used an NG tube before surgery. The first question posed was whether he thought, "we should have used an NG tube" at the time that he first "looked at the CT scan and looked at the radiology report." Defendant responded, "I looked at it and felt that you could use an NG tube." Plaintiff sought to read that question and answer to the jury. After that statement, plaintiff's counsel asked defendant, "But you weren't using your retrospectoscope to—in saying, * * * we should have used an NG tube?" Defendant replied, "Probably. I mean, that's—you look at all the fluid and say she could have benefited possibly from an NG tube." Even defendant's second answer is evidence from which it could be found that defendant would have inserted an NG tube to drain the fluid in decedent's esophagus and stomach had he looked at the CT scan and x-rays or the CT scan report readily available to defendant before surgery. Plaintiff's experts also testified that defendant should have reviewed the CT scan, x-rays, and reports and known about decedent's fluid-filled stomach and esophagus before taking her to surgery.

The excluded deposition testimony, thus, was based on pertinent facts in existence at the time of the surgery, *Foxton*, 236 Or at 278-79, not subsequently occurring conditions, and it had a tendency to make more probable a fact of consequence, namely, causation. The deposition testimony supported plaintiff's theory in his case-in-chief that defendant would have acted differently but for his failure to look at the CT scan and x-rays or to read the radiology report, *i.e.*, he would have placed the NG tube before surgery, and eliminated the next sequence of events leading to decedent's death. It thus was relevant under OEC 401.

Similarly, on cross-examination of defendant, plaintiff attempted to use the deposition testimony to undermine the credibility of defendant and to contradict the defense theory that no one would have done anything differently had defendant looked at the CT scan and x-rays and the radiology report. *See Washington v. Taseca Homes, Inc.*, 310 Or 783, 789-90, 802 P2d 70 (1990) (a party-opponent's statement may

have dual probative value as an admission and for impeachment). At trial, defendant testified that he had made his decision not to insert an NG tube before surgery given his "clinical evaluation." But whether defendant would have inserted an NG tube before surgery because he would have appreciated the need for it upon viewing the CT scan or x-rays or reading the CT scan report was a key issue disputed throughout the trial. The trial court erred in excluding defendant's admission from plaintiff's case-in-chief and prohibiting plaintiff from using it to cross-examine defendant in defendant's case-in-chief based on relevance.

Defendant further argues that, even if it was error to exclude the deposition testimony and not to allow plaintiff to cross-examine defendant using that testimony, the error was harmless. We begin our analysis of the issue by addressing the test for harmless evidentiary error.

The context of a legal error is significant when determining whether an error committed at trial is harmless. *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003). Indeed, the court's analysis "may vary depending on the context of the error in question, such as error in admission of evidence, jury instructions, or other matters of trial procedure." *Id*. An evidentiary error is reversible only if it substantially affects a party's rights. *Jett v. Ford Motor Co.*, 335 Or 493, 500, 72 P3d 71 (2003); *see also* OEC 103(1) ("Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"); ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party.").

Relying on *Gritzbaugh Main Street Prop. v. Greyhound Lines*, 205 Or App 640, 654, 135 P3d 345, *adh'd to on recons*, 207 Or App 628, 142 P3d 514 (2006), *rev den*, 342 Or 299 (2007), plaintiff argues that an error substantially affects the rights of a party "[i]f the admission of the evidence had some 'likelihood of affecting the jury's result[.]' " Defendant contends that the Supreme Court in *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 173, 61 P3d 928 (2003), set forth a stricter test for reviewing errors than the "some likelihood" test this court applied in *Gritzbaugh*. Defendant argues that

the correct test is whether the error "cause[d] something more than the 'possibility' of a different result," citing *Shoup*, 335 Or at 173. We agree with plaintiff that our formulation of the test in *Gritzbaugh* governs.

In *Shoup*, the question before the Supreme Court was whether the trial court's error in submitting one of the plaintiff's specifications of negligent conduct to the jury substantially affected the defendant's rights to warrant a reversal. 335 Or at 167-68. The court held that, because the verdict form did not identify which specification of negligence the jury relied on to find the defendant negligent, the court could not determine whether the jury's verdict was based on the invalid specification and so could not conclude that the trial court's error substantially affected the defendant's rights. *Id.* at 176. In reaching that conclusion, the court stated that "[t]he *possibility* that an error might have resulted in a different jury verdict *is insufficient* under [ORS 19.415(2)]. Instead the court must be able to conclude, from the record, that the error 'substantially affect[ed]' the rights of the losing party." *Id.* at 173 (emphasis added). We understand defendant's argument to be that, based on that passage from *Shoup*, the Supreme Court has rejected the "some likelihood of affecting the jury's result" test for other trial errors, including evidentiary errors.

Defendant's broad reading of *Shoup*, however, is undercut by the Supreme Court's caution since *Shoup* to distinguish the species of error under consideration and the circumstances in which that error occurs. As noted, the harmless error analysis varies depending on the context of the error. *Davis*, 336 Or at 33. In *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 337 Or 319, 326, 96 P3d 1215 (2004), the Supreme Court stated that different kinds of asserted trial error "may call for a different analysis of whether the error substantially affect[s] the rights of a party under ORS 19.415." (Internal quotation marks omitted.) And more recently, in *Wallach v. Allstate Ins. Co.*, 344 Or 314, 329, 180 P3d 19 (2008), the Supreme Court held that, when an incorrect instruction permits the jury to reach a legally erroneous result, *i.e.*, the jury verdict *might have been affected* by the instructional error, the error substantially affects the rights of the objecting party. *See also Cler v. Providence Health*

*System-Oregon*, 349 Or 481, 493, 245 P3d 642 (2010) (when in closing argument defense counsel characterized the purported testimony of a witness who did not make it to trial to testify, and despite the trial court's admonition to the jury that arguments were not evidence, the error created "an unacceptable risk that the jury would consider the statement as that of the unsworn witness" and thereby substantially affected the plaintiffs' rights in a trial resulting in a defense verdict). Accordingly, we reject defendant's reliance on *Shoup* for his argument that plaintiff in this case must establish that the jury found that plaintiff's proof failed on causation because of the evidentiary error.

We have held repeatedly and recently that evidentiary errors substantially affect a party's rights and require reversal when the error has some likelihood of affecting the jury's verdict. *See, e.g.*, *Lasley v. Combined Transport, Inc.*, 234 Or App 11, 21, 227 P3d 1200, *clarified on recons*, 236 Or App 1, 237 P3d 859 (2010), *aff'd*, 351 Or 1, 261 P3d 1215 (2011) ("Evidence of [defendant]'s intoxication likely would have influenced the jury's determination * * *. Therefore, the error * * * substantially affected [defendant]'s rights and requires remand for a new trial."); *Wroncy v. Klemp*, 219 Or App 578, 582 184 P3d 1133 (2008) ("[T]he party challenging the exclusion [of evidence] must show that the exclusion affected a substantial right, that is, that the excluded evidence could have affected the outcome of the trial."); *Gritzbaugh*, 205 Or App at 654. We see no reason to depart from that standard. If we were to adopt defendant's proposed rule that a party must prove that an evidentiary error caused the jury to render its verdict against that party, the proof problem would be large indeed.

In this case, the jury found defendant negligent but did not find that his negligence caused decedent's death. Therefore, the error is prejudicial if there is some likelihood that it affected the jury's determination on the issue of causation. Defendant argues that we should not disturb the jury's verdict because the excluded evidence was relevant only to negligence and not to causation, and therefore plaintiff cannot establish that the evidentiary error affected the verdict. We disagree with the premise of that argument.

As discussed above, defendant's admission that he thought decedent could have used an NG tube once he looked at the CT scan and the radiology report is relevant to causation, because it supports plaintiff's theory that defendant would have placed an NG tube before surgery and avoided the torn pharynx, the neck infection, and decedent's death. Furthermore, although plaintiff introduced expert testimony that defendant's conduct fell below the standard of care and led to decedent's death, the deposition testimony would have done more than merely bolster the credibility of plaintiff's expert witnesses. It would have undermined defendant's trial testimony and his jury argument that he had properly used his clinical evaluation in deciding not to place an NG tube in decedent before surgery. Defendant argued to the jury that he had all the information he needed when he took decedent to surgery and that inserting an NG tube before surgery was unwarranted, improper, and risky. Plaintiff could have used the deposition testimony to undermine those arguments. Moreover, defendant's deposition testimony would have contradicted the defense theory that, had defendant seen the CT scan or the report, defendant would not have changed his decision to take decedent to surgery without first placing an NG tube to decompress decedent's stomach and esophagus. We conclude that the jury's determination of causation might have been affected had the jury heard defendant's pretrial testimony about his reaction to seeing the CT scan and report.

Accordingly, the error in excluding defendant's deposition testimony substantially affected plaintiff's rights, and, thus, we reverse and remand on plaintiff's first and second assignments of error. In light of our disposition of those assignments of error, we need not reach his final assignment of error.

Reversed and remanded.