DEVORE, P. J.
*455 This appeal arises from an insurance dispute after a warehouse fire. The issue in this case concerns the admissibility of an inventory spreadsheet of the warehouse contents that the jury was allowed to consider before awarding plaintiffs $832,000 in damages. The trial court admitted the spreadsheet over defendant's hearsay objections, ruling that the spreadsheet, which had been prepared by plaintiffs' adjusters, satisfied the business-record exception to the hearsay rule under OEC 803(6). Defendant challenges that ruling. We agree that the spreadsheet was not admissible as a business record because its information about dollar values originated from outside sources who were not under a duty to report such information to the adjusters. See State v. Cain , 260 Or.App. 626, 632-34, 320 P.3d 600 (2014) (discussing duty to report requirement). We reverse and remand.
We review the trial court's factual determinations for any evidence in the record that supports them, and we review the court's legal conclusions regarding the admissibility of a hearsay statement under an exception to the hearsay rule for legal error. State v. Cook , 340 Or. 530, 537, 135 P.3d 260 (2006).
Plaintiffs Jerry and Debbie Morgan own and operate Boyd's Meat Co., a meat processing and restaurant supply company, which was insured under a policy unrelated to the one at issue in this case. Boyd's leased a warehouse a few blocks away from its meat processing plant to store its supplies and equipment. Boyd's had a second insurance policy to cover its property in the warehouse. The warehouse and the property inside were destroyed in a fire. Under that second policy, Boyd's received the policy limits, $125,000, for its lost business property.
The Morgans had a separate, personal, homeowners' insurance policy with defendant (Valley) that covered fire losses to their personal property with a blanket policy limit of $832,000. Their policy covered personal property owned or used by an insured "anywhere in the world."[1] That *456 homeowners' policy is the policy at issue in this case. The Morgans claimed that personal property was also stored and destroyed at the warehouse. They reported that the personal property included old meat processing, restaurant, and other industrial equipment acquired over the years-equipment that Mr. Morgan spent his spare time repairing or restoring. They contended that the loss of those commercial items should be covered under the homeowners' policy.
Soon after the fire, the Morgans hired Adjusters International Pacific Northwest (Adjusters International), a claims adjusting company, to prepare their personal property claim. In turn, Adjusters International hired three separate independent contractors to perform related tasks to assist in the creation of an inventory spreadsheet to support the Morgans' claim. Adjusters International did not engage any employee of its own in the preparation of the spreadsheet. The independent contractors worked for Adjusters International, not one for another. Their resulting spreadsheet listed nearly 1,300 items destroyed in the fire, showed the replacement cost values for each item, and concluded with the actual cash value of each item after subtraction of depreciation.[2] The total *329 value exceeded $1,000,000, but the claim was limited to the policy limit of $832,000.
Shortly after the spreadsheet was submitted, Valley sought additional information about the claim. In response, the Morgans filed this action against Valley for breach of contract. Valley moved in limine to exclude the spreadsheet, arguing that it included inadmissible hearsay. The Morgans acknowledged that the spreadsheet included hearsay but argued that it was admissible under the business-record exception to the hearsay rule. The trial court denied Valley's motion, reasoning that the spreadsheet would be admissible as a business record of "the adjusters who do this regularly in the normal course of their business" under OEC 803(6), provided that the Morgans could lay a proper foundation at trial.
*457 At trial, adjuster Randy Gower, of Gower, Inc., testified that Adjusters International had hired him to oversee and submit the inventory spreadsheet to Valley. Gower explained that he is an independent public adjuster licensed in Oregon and Washington who works for insurers or insureds and who does 90 percent of his work for Adjusters International. He acknowledged that Adjusters International was to be paid by receipt of 10 percent of the Morgans' total recovery from Valley and that he was to receive 25 to 27 percent of that 10 percent. Asked if he earns more money if the Morgans do, Gower replied, "Absolutely."
Gower provided an overview of the process of creating the inventory spreadsheet. Adjusters International had told him that he would work with two other independent contractors that Adjusters International had hired. The first was Craig Ritchie, who was responsible for visiting the warehouse site and identifying the losses. The second was Heather Connell, who was responsible for creating a spreadsheet and researching replacement costs. Ritchie sent photographs and recorded statements to Connell. She listed Ritchie's information in the spreadsheet.
In addition to the items inventoried by Ritchie, Gower explained that Mr. Morgan made a "memory list" of hundreds of items that Ritchie could not identify. Those items were added to the spreadsheet over the course of several months. Mr. Morgan also identified the ownership interest of each item on the list. Relying on Mr. Morgan's notes, Gower had those changes incorporated into the spreadsheet. Gower did not know how many different people provided information that was entered into the spreadsheet. After Gower received the final spreadsheet from Connell with replacement cost values, Gower next worked with Mr. Morgan to depreciate each item on the spreadsheet. After all of that was completed, about one year after the fire, he sent a copy of the final spreadsheet to Valley.
Gower had no knowledge about how the other adjusting contractors kept their records in the course of their businesses. He admitted that he did not have a duty to keep official corporate documents for Adjusters International or any other entity involved in the spreadsheet process. He claimed *458 that the spreadsheet was his business record, but he admitted that it was Connell who created it and that the spreadsheet bore the name and logo of Adjusters International.
At the conclusion of Gower's testimony, the Morgans offered the spreadsheet as evidence to prove the personal property destroyed in the fire and the value of each item. Based on Gower's testimony, the trial court admitted the spreadsheet as a business record under OEC 803(6) and over Valley's objections.[3]
Ritchie testified at trial, too. He was an employee of Greenspan Adjusters International, a separate entity from Adjusters International. He acknowledged that he was to receive a share of Adjusters International's 10 percent commission of the Morgans' recovery from Valley. Ritchie recounted that he visited the warehouse, took photographs, and documented the loss on a digital voice recorder. Ritchie inventoried 567 of the 1295 items listed on the spreadsheet. He said that *330 he had no knowledge as to who added the latter 728 additional items on the spreadsheet. He sent the audio file and the photographs to "a secondhand party from [his] company, which was Heather Connell." Connell turned his information into the property-listing part of the spreadsheet.
Connell's testimony was offered in the form of a perpetuation deposition that was read to the jury. She testified that she is an inventory specialist with her own company, DYP Enterprises. Adjusters International hired DYP Enterprises to create the inventory spreadsheet, research replacement costs for each item, and work with Mr. Morgan to "flesh out the inventory list." In her words, her "job function was to take the physical inventory that had been produced by [Ritchie] and work with Mr. Morgan on the list that he created * * * to put it all into one master list, and then work with Mr. Morgan to develop the cost to replace those items today." The replacement cost values represented "what it would cost to go out and buy [the item] today."
Connell collected the dollar values in the form of such replacement costs. To gather those figures, Connell *459 said that she relied on the internet, telephone conversations with vendors, or visits to local stores. In "some instances, if it was a collaborative effort with Mr. Morgan, especially for the items that were-that were completely gone, he would often send over a 'here's what I had,' and then we would cross-check it to make sure it was accurate." Connell added that one of her "office data entry people" helped her to create the spreadsheet. For example, if "Jerry sent [Connell] a 28-page fax," she would ask the assistant to "transcribe it into the spreadsheet." Connell also asked the assistant to call vendors and get replacement costs quotes over the phone. Connell testified that, despite her reliance on the assistant to gather information into the spreadsheet, everything "filter[ed] through me in the end."
Mr. Morgan testified about the spreadsheet, as well. He explained that he gave information to correct for ownership interests of different items, and he personally created a list of hundreds of items that were added to the spreadsheet. Those items were added to the 567 items inventoried by Ritchie. Mr. Morgan testified that he checked about 90 percent of Connell's replacement cost values for accuracy. Taking the replacement costs collected by Connell, he worked with Gower to subtract depreciation from each item so as to arrive at the "actual cash value" shown on the spreadsheet. When Mr. Morgan claimed to have "rebuilt" an item, he classified the item as "new" before his depreciation calculation. He knew the actual age of only two of the nearly 1300 items but assigned ages to "the best of his knowledge." He signed every page of the inventory and believed that it included all of his personal property that was lost. Valley cross-examined Mr. Morgan but did not present its own evidence of the values of lost property.
At the conclusion of the trial, the jury returned a verdict in favor of the Morgans for $832,000, the full policy limit. The trial court entered a general judgment in that amount.
On appeal, Valley renews its argument that the trial court erred in admitting the spreadsheet under the business-record exception to the hearsay rule. Valley contends, among other things, that the spreadsheet is inadmissible as a *460 business record because it was prepared for use in litigation, it was not prepared in the ordinary and routine course of business, each person who was actively involved worked for a different company (not each other), and the spreadsheet contained information from third parties who did not owe a duty to report accurately. Critically, those third parties-Mr. Morgan and the unidentified outside sources-provided the information used for various property values. The Morgans contend that the court did not err in admitting the spreadsheet as a business record and, alternatively, that any error was harmless because Mr. Morgan testified from his personal knowledge about the properties in the spreadsheet. For the reasons that follow, we conclude that the spreadsheet was inadmissible as offered.
Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Such a statement is generally inadmissible unless it satisfies a hearsay exception or is excluded from the *331 category of hearsay. See OEC 801(3) (defining hearsay); OEC 802 (stating that hearsay is generally inadmissible); OEC 803 and 804 (providing hearsay exceptions); OEC 801(4) (providing exclusions to hearsay). The business-record exception to the hearsay rule allows admission of:
"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness."
OEC 803(6).
The rationale for the business-record exception is that, despite being hearsay, documents prepared routinely to record a business's ordinary commercial activities carry a presumption of "unusual reliability" incidental to carrying out the business's needs and obligations. Legislative *461 Commentary to OEC 803, reprinted in Laird C. Kirkpatrick, Oregon Evidence § 803.06[2], 806 (6th ed. 2013); Lepire v. MVD , 47 Or.App. 67, 74, 613 P.2d 1084 (1980) ("The basis of the rule allowing business records into evidence as an exception to the hearsay rule is the probability of trustworthiness of records because they were routine reflections of the day to day operations of a business." (Internal quotation marks omitted.)). The Legislative Commentary to OEC 803(6) notes that the "unusual reliability of business records, which makes them admissible, is variously ascribed to the regular entries and systematic checking which produce habits of precision, to actual reliance of the business upon them, and to the duty of the record keeper to make an accurate record." Kirkpatrick, Oregon Evidence § 803.06[2] at 806.
We have previously explained, however, that "statements in a business record that come from persons outside the business generally are not afforded the same presumption of reliability." Cain , 260 Or.App. at 632, 320 P.3d 600 ; see also Kirkpatrick, Oregon Evidence § 803.06[2] at 806 ("[i]f the supplier of the information does not act in the regular course of business * * * an essential link is broken: the assurance of accuracy does not extend to the information itself , and the fact that it may be recorded with scrupulous accuracy is of no avail" (emphases added)). The exception may occur when there is a third party who has a "duty to report." In prior cases, we have noted that a requirement of a "duty to report" comes from Johnson v. Lutz , 253 N.Y. 124, 170 N.E. 517 (1930), the leading case on the issue. See Cain , 260 Or.App. at 632-33, 320 P.3d 600 (discussing Johnson and the duty to report); see also Mayor v. Dowsett , 240 Or. 196, 226, 400 P.2d 234 (1965) (discussing Johnson ). In Johnson , the New York Court of Appeals concluded that a police accident report was not admissible under the business-record exception because it contained hearsay statements from bystanders. The court explained that the purpose behind the exception was to allow admission of business records
"without the necessity of calling as witnesses all of the persons who had any part in making it, provided the record was made as a part of the duty of the person making it, or on information imparted by persons who were under a duty *462 to impart such information. * * * It was not intended to permit the receipt in evidence of entries based upon voluntary hearsay statements made by third parties not engaged in the business or under any duty in relation thereto ."
Johnson , 253 N.Y. at 128, 170 N.E. 517 (emphasis added).
The principles described in Johnson have long been a part of Oregon law. See Snyder v. Portland Traction Company , 182 Or. 344, 351, 185 P.2d 563 (1947) (excluding police report created based on information from third parties); see also Miller v. Lillard , 228 Or. 202, 211-12, 364 P.2d 766 (1961) (excluding a report made for a state agency containing hearsay and observation by third *332 parties). That is, "[a]lthough the 'duty to report' requirement expressed in Johnson is not found in the text of OEC 803(6), it is considered 'a traditional requirement of the business records exception,' and is recognized in the Legislative Commentary to OEC 803, as well as in Oregon case law." Cain , 260 Or.App. at 633-34, 320 P.3d 600. Under our case law, "for a business record to be admissible, not only must the entrant be under a business duty to record the event, but the informant must be under a contemporaneous business duty to report the occurrence to the entrant as well." Id. (internal quotations omitted; emphasis added). If "the supplier of the information and the person recording the information are both acting in the regular course of business, then the multiple levels of hearsay are excused under the business records exception." Id .
With that overview, we consider the spreadsheet at issue in this case. The parties recognize that the spreadsheet is hearsay. Their dispute is whether the spreadsheet, which was offered to prove the items lost and their values, qualifies as a business record under OEC 803(6). Although that dispute involves a number of considerations, one is dispositive. We assume, without deciding, that Gower, a licensed adjuster, as well as Ritchie, and Connell, were all acting within the normal course of business, assuming their business was routinely documenting claims, rather than preparing an exhibit in anticipation of litigation. We assume, without deciding, that they may be treated as agents of a single enterprise, even if separately hired as independent *463 contractors on a one-time project.[4] We assume, without deciding, that Gower was qualified to lay a foundation for the spreadsheet, regardless whether it was admitted as his company's record or the record of Adjusters International, with whose record-keeping he was not generally familiar. We do not reach the final matter whether the circumstances indicate a lack of trustworthiness, when the several adjusters will be better compensated when the Morgans recover more. We need not address those matters because, in any event, Connell's reliance on third parties for property values prevents the spreadsheet from qualifying as a business record.[5]
Connell's sources of replacement cost values were outside sources, ranging from the Internet to telephone conversations with vendors. Connell and her assistant Emily obtained prices from internet websites and from unidentified vendors on the telephone. Connell and her assistant entered those values into the spreadsheet to show the replacement values of nearly 1300 items, which had been identified by Ritchie and Morgan as destroyed in the fire. Given our case law, the suppliers of such information must have been subject to a contemporaneous duty to report that information, *464 in order to satisfy the *333 business-record exception. Cain , 260 Or.App. at 633, 320 P.3d 600. They were not. Like the third parties supplying information in the reports at issue in Johnson , Snyder , and Miller , the unidentified third parties here were just volunteering price information when prompted by Connell, and they were not under a duty to do so accurately. See id. at 635-36, 320 P.3d 600.
The Morgans insist that Connell's collection of prices from unidentified third parties was not hearsay and was acceptable for the business records exception, because she had personal knowledge of the price of the items. They rely on State v. Pulver , 194 Or.App. 423, 95 P.3d 250, rev. den. , 337 Or. 669, 104 P.3d 601 (2004). Pulver was not a case that involved the business-record exception. Instead, it was a case about whether the state could prove the market value of a pair of stolen shoes with the testimony of a security guard who, having recovered the shoes, saw their price tag and scanned their UPC code. The defendant objected on the ground that such testimony was hearsay. We agreed that, if the fact to be proved were the value that the store believed the shoes to be worth, then the testimony would be hearsay. Id . at 428, 95 P.3d 250. However, market value, in terms of the theft statute, ORS 164.045, represented simply the asking price or the price at which the shoes may have been sold. The security guard, having seen the price tag, could provide direct evidence of that lesser fact. His testimony was not hearsay at all. Id .
In our case at hand, the parties agree the inventory spreadsheet is hearsay, and the Morgans urge the business-records exception as its reason for admission. Unlike the security guard in Pulver , Connell did not testify as to price tags she saw on the Morgans' equipment. Connell did not testify, as to the nearly 1300 items on the spreadsheet, that she personally observed all such items in stores with price tags. Instead, in large part, she relied on out-of-court statements posted on the internet or offered in telephone conversations with vendors concerning their goods or equipment.[6] Drawing on that information, Connell imported their *465 prices as the equivalent values of the Morgans' equipment. Those values were based on information drawn from sources that were under no duty to report to her in preparation of the spreadsheet, nor under a duty to do so accurately. Accordingly, Pulver does not justify admission of the inventory spreadsheet.
Mr. Morgan's involvement with the spreadsheet is as problematic as that of the anonymous third-party sources. As a third party to an adjuster's business, he did not have a legal duty to report, nor a duty to report accurately. Contending otherwise, the Morgans rely on our decision in Cain and argue that they were acting under a duty to report because the terms of the homeowners' insurance policy required them to present an honest proof of loss in support of their claim. We disagree.
In Cain , we concluded that a third-party supplier of information was under a "legal duty" to report for purposes of the business-record exception. 260 Or.App. at 635-36, 320 P.3d 600. In that case, the Hilton hotel had routinely transmitted employee earnings information to the Oregon Employment Department. The department created a report incorporating that information and offered it as a business record at trial to show deficiencies in the defendant's reported earnings and the earnings reported by his employer, the Hilton. The defendant challenged the admission of the report, arguing that the report included double hearsay involving the statements from the Hilton. Id . at 630-31, 320 P.3d 600. However, the Hilton was under a statutory duty to "keep true and accurate records" and regularly to report the information accurately to the department; and administrative rules required the Hilton to provide its information to the department upon request. Id. at 635, 320 P.3d 600 (citing, inter alia , ORS 657.660(1) ). Making a critical distinction, we concluded that,
*334 "[u]nlike the third parties supplying information in the reports at issue in Johnson , Snyder , and Miller , the Hilton was not volunteering defendant's earnings information to the department, but rather was under a legal duty to provide the information and to do so accurately . Thus, the reports to the department possess the requisite indicia of reliability or trustworthiness required for admission under the business records exception."
*466 Id . at 635-36, 320 P.3d 600 (emphasis added). For that reason, the facts in Cain led to a different conclusion.
In this case, Mr. Morgan provided third-party information, like the Hilton in Cain, but he lacked the same "legal duty" to report such information. That is, several witnesses testified that Mr. Morgan provided a substantial amount of information that was incorporated into the spreadsheet. Connell testified that she or her assistant "transcribed" hundreds of items into the spreadsheet based on Mr. Morgan's "memory list" of equipment. At Mr. Morgan's direction, Gower prompted changes in the spreadsheet as to ownership interests of numerous items. And, Mr. Morgan testified that he "did the work on the depreciation" to reach each item's "actual cash value." But, in so doing, Mr. Morgan, was not providing routine information, prompted by law with accuracy required, like an employer's regular reports to a state agency. He did not have a "legal duty" to make routine reports to Connell, Gowers, or Adjusters International, nor any particular legal duty to do so with the accuracy of an employer reporting an employee's wages to a state agency. For purposes of the business-records exception, Mr. Morgan was a third-party volunteer as to an adjuster's business, not materially distinguishable from the vendors or internet sources who provided hearsay information.
Although the Morgans had a contractual relationship with Valley, that fact does not make the Morgans' reporting to Valley routine or "unusually reliable." See Kirkpatrick, Oregon Evidence § 803.06[2] at 806 (quoting legislative commentary explaining business records involving "unusual reliability"). Their relationship was unavoidably adversarial. Although the Morgans would have had an implied duty of good faith and fair dealing in their dealings with Valley, as in any contractual relationship, see, e.g. , Klamath Off-Project Water Users v. Pacifi c orp , 237 Or.App. 434, 445-46, 240 P.3d 94 (2010), rev. den. , 349 Or. 602, 249 P.3d 123 (2011) (recognizing the principle), we find no authority to suggest that such a general principle, often employed to restrain bad conduct, creates a specific legal duty to report reliably accurate information to be incorporated in someone else's business records. That may be so for an obvious reason. The *467 contractual duty of good faith and fair dealing would allow a broad range of opinions of value-even allowing dramatically different opinions-without the difference of values being so extreme as to require determination that the duty of good faith and fair dealing has been breached.
Regardless whether Mr. Morgan provided information to his adjusters or indirectly to Valley, he was not acting in the ordinary course of business and was not under a legal duty to accurately report such information. Cain , 260 Or.App. at 635-36, 320 P.3d 600 ; see also Snyder , 182 Or. at 351, 185 P.2d 563 (police officer's investigative report was not admissible as a business record because his report was based primarily on what "various individuals-including interested parties-told him about it"). Thus, the information from Mr. Morgan did not differ materially from that of anonymous third parties for purposes of the business-records exception.
The Morgans argue that, if the court erred in admitting the spreadsheet as a business record, the error is harmless because Mr. Morgan essentially adopted the inventory through his testimony. That is significant, they contend, because it is "well settled that the owner of property may testify concerning his property and its value." That possibility is indeed significant. See , e.g. , Northwest Natural Gas Co. v. Shirazi , 214 Or.App. 113, 120, 162 P.3d 367, rev. den. , *335 343 Or. 223, 168 P.3d 1154 (2007) (reciting that a property owner can testify as to the value of his or her own property). But, that possibility does not render the admission of the spreadsheet harmless. Evidentiary error is harmless when the error does not " 'substantially affect[ ] a party's rights.' " Bergstrom v. Assoc. for Women's Health of So. Ore. , 283 Or.App. 601, 609, 388 P.3d 1241 (2017) (quoting Dew v. Bay Area Health District , 248 Or.App. 244, 256, 278 P.3d 20 (2012) ). "An evidentiary error 'substantially affect[s] a party's rights' where it 'has some likelihood of affecting the jury's verdict.' " Id.
In this case, the spreadsheet was offered as the business record of Gower or Adjusters International. It was not offered as Mr. Morgan's opinion of the values of nearly 1,300 items of property. When asked whether he checked the spreadsheet's items for accuracy, Mr. Morgan said that he "scanned the item, scanned the cost and depreciation."
*468 He verified, at most, "90 percent of the replacement [cost] values." Even assuming Mr. Morgan wholly concurred in each and all of the adjusters' values for nearly 1,300 items of property, the spreadsheet was presented as largely representing the work of Ritchie, Connell, and Gower in gathering raw replacement cost figures and then, with Mr. Morgan's participation, reducing those figures for depreciation.
To the extent that the spreadsheet represents the work of those several adjusters, it is not the work of the Morgans, and the spreadsheet itself remains inadmissible hearsay. Assuming that Mr. Morgan had offered his own independent opinion of values, the question of harmless error turns on whether the erroneous admission of the spreadsheet had "some likelihood of affecting the jury's verdict" on property values. To be sure, an owner's opinion of values will be admissible and, standing alone, have its own probative value. However, unless the owner's opinion is somehow conclusive , the admission of the owner's opinion does not necessarily render harmless the admission of improper evidence of property values. That is because an owner's opinion of values may be buttressed or corroborated when supported by independent evidence that adds probative force. Here, the inadmissible spreadsheet offered just such seemingly independent, corroborative evidence. It was offered by witnesses who brought the experience of two claims investigators, Gower and Connell, who regularly dealt with casualty losses, who spoke the language of insurance companies, and who testified as to their extensive efforts to gather replacement costs from several sources-sources other than Mr. Morgan-and who factored in their own knowledge of depreciation to arrive at well over a thousand different dollar values on a comprehensive spreadsheet. Their experience with casualty losses, property valuation, and insurance companies would lend probative value to the Morgans' loss figures. For those reasons, we conclude that the addition of that inadmissible hearsay evidence had "some likelihood" of affecting the jury's assessment of property values. The admission of the spreadsheet cannot be harmless error.
In sum, the inventory spreadsheet was not admissible under OEC 803(6) as a business record. It was not admissible because its dollar values were primarily derived *469 from outside sources who did not have a duty to report to the Morgans' adjusters. Accordingly, the general judgment and supplemental judgment are reversed and remanded.
Reversed and remanded.

The policy also covered up to $250 for business property lost on the premises. Valley paid the Morgans $250 under the homeowners' policy for any business property destroyed in the fire.

Several different versions of the spreadsheet were admitted, including a "Master List," but we do not understand any of them to be materially different for purposes of appeal. Therefore, throughout this opinion, we simply refer to "the spreadsheet."

The record is not entirely clear whether the spreadsheet was admitted as a record of Gower, Inc. or as a record of Adjusters International.

We do not decide the impact of a business form or the supervision of agents, whether as employees or independent contractors. A New York case addressed a similar issue, concluding that separate adjusters were separate businesses, who did not satisfy the business records exception. That decision declared:
"The [trial] court properly denied plaintiff's request to introduce into evidence, as records kept in the regular course of business of the New York Board of Fire Underwriters, certain reports of Winchester Associates, Inc., prepared at the request of the board and found in the board's files * * *. Although Dennis Perlbert, a partner in the law firm which represents the board, testified that the reports were maintained by the board in the ordinary course of its business, the fact is that the reports were not prepared by the board but by an employee of Winchester Associates, Inc., an independent adjuster. Further, it is stated in these documents that the reported estimates of sound value and of the cost of repairs were made by still another firm, Gabler Construction Co., Inc. 'The mere filing of papers received from other entities, even if they are retained in the regular course of business, is insufficient to qualify the documents as business records.' (Standard Textile Co. v. National Equip. Rental , 80 A.D.2d 911[, 437 N.Y.S.2d 398 (1981) ] ). Under these circumstances, the trial court did not err in refusing to admit the reports in question into evidence."
Romanian Am. Interests v. Scher , 94 A.D.2d 549, 550-51, 464 N.Y.S.2d 821 (1983).

Because that is so, such other potential problems with this spreadsheet may not recur after remand and upon a new trial. Evidence of properties lost and their values is likely to be presented anew, with a different evidentiary foundation, and through different or additional witnesses.

Connell was not qualified as an expert, such as an antique dealer, who might offer an expert opinion of values based on information reasonably relied upon by experts in the field that is not admissible in evidence. See OEC 703 (regarding bases of expert opinions).